# United States District Court
# Central District of California

ZIPSHADE INDUSTRIAL (B.V.I.) Corp.,

      Plaintiff/Counter-Defendant,

      v.

LOWES HOME CENTERS, LLC;

WHOLE SPACE INDUSTRIES; and

DOES 1–50, inclusive,

      Defendants/Counter-Claimants.

Case № 2:14-cv-05934-ODW (JC)

**CLAIM CONSTRUCTION ORDER**

## I.   INTRODUCTION

This patent infringement case involves patent number 8,245,756 ("the '756 Patent") entitled "Pull Down, Push Up, Shade Apparatus" owned by Plaintiff-Counter Defendant Zipshade International Corporation ("Zipshade").   (First Am. Compl. ("FAC") ¶ 9, ECF No. 17.)   Defendant-Counterclaimant Wholespace Industries Ltd. ("Wholespace") manufactures Roman shades for Defendant-Counterclaimant Lowe's Homecenter's Allen + Roth Brand which allegedly include an infringing apparatus. (*Id.* ¶¶ 10, 13–19.)

The '756 Patent allows for the raising or lowering of window shades and Venetian blinds (collectively "window coverings") by hand.  ('756 Patent, Col. 1:10–

13, 22–24, ECF No. 120-2.) Before Plaintiff's invention, such window coverings were typically raised or lowered with the assistance of a pull-cord. (*Id.* at Col. 1:10–17.) Designing out the pull-cord makes window coverings easier to manipulate and eliminates any risk of strangulation for small children. (*Id.* at Col. 1:17–20.) In addition to eliminating the pull-cord, the invention also ensures that window coverings are "automatically kept level." (*Id.* at Col. 1:26–27.)

On June 9, 2016, the Court held a claim construction hearing regarding the five most significant terms as identified by the parties: rotary member, rotor, primary line/lifting cord, secondary line, and coupled. (ECF No. 139.) This claim construction order defines those terms.

## II.  FACTUAL BACKGROUND

 

As might be expected for a common household item like a window covering, the '756 Patent references a long list of prior art dating back decades. The '756 Patent is a continuation in part from patent number 6,837,294 (Appl. No. 10/623,776) ("the '294 Patent"), which itself is a continuation in part from patent number 6,991,020 (Appl. No. 10/360,305) ("the '020 Patent").

This case began when Plaintiff filed a complaint alleging a single cause of action for infringement on July 29, 2014. (Compl. ¶¶ 13–19, ECF No. 1.) Plaintiff filed a first amended complaint on August 15, 2014. (ECF No. 17.) On November 10, 2014, Defendants each filed an answer and a counterclaim requesting declaratory relief (noninfringement and invalidity). (ECF Nos. 46–47, 50–51.) Plaintiff filed answers to the counterclaims on December 12, 2014. (ECF Nos. 70–71.)

On January 5, 2015, Defendant Wholespace filed a petition for inter partes review of the '756 Patent (IPR 2015-00488). (*See* Stip. to Stay 2, ECF No. 76.) On July 24, 2015, the PTAB denied Defendant Wholespace's request for inter partes review in its entirety citing Defendant Wholespace's failure to: "identify clearly the grounds and references on which [it] is relying to assert that the challenged claims are not patentable; . . . to specify sufficiently where the limitations of the challenged claims are taught or suggested by the cited references; and . . . to provide a sufficiently detailed explanation of the significance of the citations to these references and the Judkins declaration—as required under [various statutes and federal rules]." *Wholespace Indus. v. Zipshade Indus. Corp.*, IPR2015-00488, at 18 (PTAB July 24, 2015). In short, Defendant Wholespace's argumentation and use of references was so poor that the PTAB believed institution of inter partes review would be a waste of time. *Id.* ("we are not persuaded that the record before us demonstrates a reasonable likelihood that [Defendant Wholespace] will prevail in establishing that at least one challenged claim would have been obvious").

On July 29, 2015, Defendant Wholespace filed another petition for IPR seeking to correct the problems highlighted by the PTAB in its July 24, 2015 decision. (Status Report 2–3, ECF No. 82.) On January 29, 2016, the PTAB again rejected Defendant Wholespace's request for IPR. *Wholespace Indus. v. Zipshade Indus. Corp.*, IPR 2015-01632, at 10 (PTAB Jan 29, 2016). The PTAB concluded that Defendant Wholespace's new petition was substantially the same as its previous petition. *Id.* at 9.

On February 16, 2016, Plaintiff and Defendants submitted their Joint Claim Construction and Prehearing Statement. (ECF No. 98.) Plaintiff and Defendants agreed that the five most significant (and likely case dispositive) terms are: rotary member, rotor, primary line/lifting cord, secondary line, and coupled. (Joint Claim Construction Prehearing Statement ("JCCPS") 50, ECF No. 98.) However, they agreed on little else. Plaintiff proposed five additional terms for construction and Defendants put forth countless other terms/phrases for construction based on the sides' initial exchange of terms. (*Id.* at 2–49.)

Defendants pointed out in the statement that Plaintiff changed many of its proposed constructions and disclosed its expert witness only four days before the Joint Claim Construction and Prehearing Statement was due in violation of the Northern District of California Local Patent Rules 4-1 and 4-2, which require the exchange of constructions and citations to supporting evidence at least twenty-one days prior to the submission of the Joint Claim Construction and Prehearing Statement. (*See id.* at 53–58; *see also* N.D. Cal. Patent L.R. 4-1, 4-2). Based on this failure to disclose, Defendants requested that the Court compel Plaintiff to use its originally proffered terms and constructions. (JCCPS 58.) Defendants also requested that the Court exclude Plaintiff's expert witness from testifying. (*Id.* at 59.) Plaintiff responded by arguing that its redefinition of terms was merely a narrowing of its original list necessary to comply with the Court's ten-term limit and that there was still plenty of time for Defendants to depose the witness before the claim construction hearing. (*Id.* at 60.)

On March 15, 2016, Defendants filed a "Motion to Strike Plaintiff's Expert Witness and Expert Witness Summary" from the Joint Claim Construction and Prehearing Statement. (ECF No. 105.) Defendants put forth largely the same arguments they made in the Joint Claim Construction and Prehearing Statement. (Mot. 2–10, ECF No. 105.) Plaintiff also put forth largely the same arguments it made in the Joint Claim Construction and Prehearing Statement, adding that Northern

District of California Local Patent Rule 4-4[1] allows for the identification of a witness in either the preliminary exchange *or* in the Joint Claim Construction and Prehearing Statement. (Opp'n 5–8, ECF No. 109.) The Magistrate Judge took the middle road: granting in part and denying in part Defendants' motion. (ECF No. 115.) She ordered Plaintiff to produce an expert report and make its expert available for deposition and allowed Defendants to identify a rebuttal witness. (*Id.*)

On July 15, 2016, the United States Patent and Trademark Office ("PTO") granted ex parte reexamination of the '756 Patent in light of a "substantial new question of patentability." (RJN, Ex. A at 6, ECF No. 118.) On January 17, 2017, the PTO issued a reexamination certificate affirming the patentability of all twenty-four of the patent's claims. (ECF No. 127-1.) No changes were made to the claim language, specification, or figures. (*Id.*)

On February 21, 2017, the Court issued an order setting the remaining dates and deadlines for claim construction. (ECF No. 130.) On March 30, 2017, Defendants submitted their claim construction brief. (ECF No. 131.) In their brief, Defendants continued to evince a lack of clarity as to exactly which terms would be construed at the claim construction hearing. (Defs. Br. 1–4, ECF No. 131.) Defendants also filed a supplement to their claim construction brief requesting that the Court exclude "the report" of Plaintiff's expert witness, Dr. Pratt, and "any testimony" relating to the report at the claim construction hearing. (Defs. Suppl. Br. 1, ECF No. 132.)

With Plaintiff and Defendants seemingly still at odds over exactly which terms would be construed at the claim construction hearing, the Court took action to impose some order on the process. On April 7, 2017, the Court informed the parties that it would construe the five most significant terms, which the parties had already briefed and agreed were likely to be case dispositive. (ECF No. 135.) On April 26, 2017, Plaintiff filed its reply. (ECF No. 136.)

---

[1] The Court has adopted the Northern District of California's Local Patent Rules. (*See* Patent Standing Order, ECF No. 10.)

On June 9, 2017, the Court received a demonstration of the technology and held a claim construction hearing. (*See* ECF No. 139.) At the conclusion of that hearing, the Court took the matter under submission. (*Id.*)

## III. LEGAL STANDARD

Claim construction is an interpretive matter "exclusively within the province of the court," that begins with an analysis of the claim language itself. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). This process involves an analysis of how a person of ordinary skill in the art ("POSITA") would interpret the relevant term(s) in light of both the claim in which the term appears and of the entire patent. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). Accordingly, claims must be read in light of the specification, which is "always highly relevant to the claim construction analysis." *Id.* at 1315 (internal quotations omitted). That being said, the general rule is that limitations from the specification may not be imported into the claims. *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186–87 (Fed. Cir. 1998). "[T]he line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms." *Phillips*, 415 F.3d at 1323.

The "ordinary and customary meaning" of disputed claim terms is at the heart of claim construction. *Phillips*, 415 F.3d at 1312–13 (internal quotations and citations omitted). However, in two situations, meanings other than the "ordinary and customary" will supersede: (1) when a patentee sets out a definition and acts as his own lexicographer; or (2) when the patentee disavows the full scope of a claim term either during prosecution or in the specification. *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

## IV. DISCUSSION

**A. Admissibility of the Plaintiff's Expert Witness's Report/Testimony**

Plaintiff and Defendants are sharply divided on the issue of whether evidence offered by Plaintiff's expert, Dr. Pratt, should be admitted. Defendants put forth two arguments for excluding Dr. Pratt's report and testimony. (Defs. Suppl. Br. 2–5.)

**1. Dr. Pratt Does Not Possess Sufficient Experience in the Window Coverings Industry to be an Expert or a POSITA**

First, Defendants argue that Plaintiff's expert does not have sufficient experience in the window coverings industry to qualify either as an expert or a POSITA. (*Id.* at 1, 3–4.) In support of this position, Defendants point out that Dr. Pratt admitted during his deposition that he has no window covering design experience and that he would not be considered a POSITA in that industry. (*Id.*) Based on these statements and Dr. Pratt's background, Defendants argue that this case is substantially similar to *Sport Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316 (Fed. Cir. 2016) in which the Federal Circuit affirmed a Central District of California court's decision to exclude an expert witness. (Defs. Br. 24.) In *Sport Dimension*, the issue was whether an industrial design consultant with four decades of experience could provide expert testimony about the design of personal floatation devices, i.e. lifejackets. 820 F.3d at 1323. In finding that the district court did not abuse its discretion in excluding the expert, the Federal Circuit noted that the expert disclaimed any expertise in the field of personal floatation devices, that his opinions were based on his "imagination" rather than any actual experience, and that he never designed a personal floatation device as part of his employment. *Id.*

In response, Plaintiff puts forth a number of cases indicating that experts need only meet minimal standards to be admitted under Federal Rule of Evidence 702. (Reply 11, ECF No. 136.) For instance, in *Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, the court emphasized that the Ninth Circuit "contemplates a *broad conception* of expert qualifications" and that an expert "need not be officially credentialed in the specific [subject] matter [area] under dispute" to be admitted. 87 F. Supp. 3d 928, 938 (2015) (quoting *Hangarter v. Provident Life & Accident Ins.*

*Co.,* 373 F.3d 998, 1015 (9th Cir. 2004) (emphasis in original) and *Massok v. Keller Indus., Inc.,* 147 Fed. Appx. 651, 656 (9th Cir. 2005)); *see also United States v. Garcia*, 7 F.3d 885, 889–90 (9th Cir. 1993) (noting this "lack of *particularized expertise* goes to the weight accorded [to] . . . testimony, not to the admissibility of [one's] opinion as an expert" (emphasis added)). The other cases Plaintiff cites confirm this broad conception. *See e.g.*, *People v. Kinder Morgan Energy Partners, L.P.*, 159 F. Supp. 3d 1182, 1190 (S.D. Cal. 2016).[2]

After thoroughly reviewing the cases presented by both sides, the Court has determined that the report and testimony of Plaintiff's expert should not be excluded on relevance grounds. This case is less about the specifics of window coverings and more about the function of a mechanism. Dr. Pratt possesses sufficient general expertise in mechanisms and related education to provide valuable insight on this topic. (*See* Pratt Report, Ex. 1 at 23 (indicating an explicit expertise in "mechanisms," and masters degree in mechanical engineering), 24 (indicating work experience developing mechanisms), ECF No. 120-3); *see also* Fed. R. Evid. 702 (courts should take into account whether an expert's "specialized knowledge will help [them] understand the evidence or to determine a fact in issue."). Dr. Pratt is a POSITA with regard to mechanisms.

In so finding, the Court notes that the present case is distinguishable from *Sport Dimension*. While not every industrial designer may have sufficient knowledge of personal floatation devices to opine on that subject, every engineer in possession of graduate degree in mechanical engineering should be able to understand the interworkings of a pulley system. Indeed, Plaintiff's expert presents, as part of his report, a sample problem from a third-year engineering textbook that is designed to test engineering students' knowledge of pulley systems. (Pratt Report 16.)

---

[2] It must be noted that none of the cases Plaintiff cites concern the admissibility of expert testimony at a claim construction hearing.

The Court also notes that its decision here is consistent with its previous decision in *Farstone Techonology, Inc. v. Apple Inc.*, No. 8:13-CV-1537-ODW, 2015 WL 857706, at \*4 (C.D. Cal. Feb. 27, 2015). In *Farstone Technology*, the issue was whether an expert with a doctorate degree in electrical engineering and teaching experience in software and hardware design was sufficiently qualified to testify at a claim construction on the subject of backup/recovery systems even though he lacked specific experience "design[ing] or implement[ing] backup/recovery systems." 2015 WL 857706, at \*4. The Court found that he was, noting that his background was sufficiently related to the subject of backup/recovery systems. *Id.*

Based on the related nature of Dr. Pratt's experience, past cases decided by this Court, and the Ninth Circuit's general consensus that "[t]he threshold for [expert] qualification is low for purposes of admissibility," the Court will not exclude Dr. Pratt's report or testimony on relevance grounds. *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 550–51 (C.D. Cal. 2014) (quoting *PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*, No. C 10–00544 JW, 2011 WL 5417090, at \*4 (N.D. Cal. Oct. 27, 2011)).

### 2. Dr. Pratt Failed to Read the Patent Owner's Statement and Prosecution History of the Parent Patents Before Authoring His Report

Defendants' second argument is that Dr. Pratt's report should be excluded because it is based on an incomplete review of the record. (Defs. Br. 23; Defs. Suppl. Br. 5.) Specifically, Defendants argue that Dr. Pratt did not review "the patent owner's statement of IPR2015-00488 and did not review arguments presented during prosecution of U.S. Patent Application Nos. 10/623,776 and 10/360,305." (Defs. Br. 23.)

Plaintiff does not deny that Dr. Pratt failed to review the patent owner's statement for IPR2015-00488 and the relevant parent patent prosecution histories in preparing his report. (Reply 14.) However, Plaintiff argues that Dr. Pratt did review the majority of relevant materials (the '756 Patent, the prosecution history of the '756

Patent, and the Joint Claim Construction and Prehearing Statement) and that Dr. Pratt's failure to review the patent owner's statement and the parent patent prosecution histories is inconsequential as these materials ultimately have no effect on any of the constructions. (*Id.*)

Federal Rule of Evidence 702 instructs courts to consider expert testimony where (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the expert has reliably applied the principles and methods to the facts of the case. The Court finds that while Dr. Pratt may not have reviewed certain relevant evidence in preparing his report, this oversight does not warrant the draconian measure of exclusion. *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."). Dr. Pratt's opinions still have some value despite his failure to review the entire record. As the Court is now acutely aware of the specific shortcomings of Dr. Pratt's report, it is more than capable of accounting for those shortcomings and will reduce the weight given to Dr. Pratt's report where appropriate.

## B. Constructions

### 1. Rotary Member (34 & 35 in figure)



| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| A pulley within the counterbalance mechanism coupled in some way to a spring and having a unique axis of rotation with one or more receiving surfaces. (Pl. Opening Br. 4, ECF No. 120.) | A single pulley such that a double pulley is two rotary members and is not a single rotary member. (Defs. Br. 9.) |

**Areas of Disagreement Between the Parties**:

Plaintiff and Defendants disagree over whether a "rotary member" may have more than one receiving surface.

**Plaintiff's Opening Argument**:

Plaintiff's argument is simple: neither the claim nor the specification indicates that rotary members must possess a specific number of receiving surfaces. (Pl. Opening Br. 4.) Plaintiff argues that the defining feature of a rotary member is not the number of receiving surfaces it possesses but rather its unique axis of rotation. (*Id.* 4–6.) Plaintiff's expert echoes this assessment. (Pratt Report 9.)

**Defendants' Response**:

Defendants' sole argument is based on a disclaimer/disavowal[3] Plaintiff allegedly made in the patent owner's statement for IPR2015-00488. (Defs. Br. 6–7.) Defendants contend that Plaintiff disclaimed/disavowed any multi-receiving surface structure from being a rotary member. (*Id.* at 7.) Specifically, Defendants point to Plaintiff's argument in the patent owner's statement regarding the Bixler patent (prior art).

*///*

---

[3] Most of the case law seems to treat disclaimer and disavowal similarly often referring to "disclaimer or disavowal." *See e.g.*, *David Netzer Consulting Eng'r LLC v. Shell Oil Co.*, 824 F.3d 989, 994 (Fed. Cir. 2016) (referencing "disclaimer or disavowal"). The Court uses disclaimer/disavowal to mean "disclaimer or disavowal" in this decision.



Defendants explain that Plaintiff argued to the PTAB that the above figure contained in the Bixler patent does not show two rotary members. (*Id.*) According to Defendant, Plaintiff indicated that while fusee h could be considered a rotary member, fusee f, which has "two surfaces for receiving cords," could not be considered a rotary member. (*Id.* 7–8.) Defendants assert that it would be not be fair or permissible to allow Plaintiff to preserve his patent before the PTAB by arguing that a multi-receiving surface structure is not a rotary member and then argue in this infringement proceeding that a multi-receiving surface structure can be a rotary member. (*Id.* at 9.)

**Plaintiff's Reply**:

Plaintiff counters by arguing that its statement to the PTAB about fusee f not being a rotary member had nothing to do with the number of receiving surfaces fusee f possesses. (Reply 3.) Instead, Plaintiff argued that fusee f could not be a rotary member because it acted as the connector for the primary and secondary line. (*Id.*)

**The Court's Analysis**:

Up until May 11, 2017, the law was unclear whether arguments made to the PTAB in an owner's statement during the IPR process could function as disclaimers/disavowals. The Federal Circuit answered that question in *Aylus Networks, Inc. v. Apple Inc.*, indicating that such statements may operate as disclaimers/disavowals regardless of whether the PTAB ultimately decides to institute an IPR. 856 F.3d 1353, 1361–64 (Fed. Cir. 2017). However, such disclaimers/disavowals must still be "clear and unmistakable." *Id.* (quoting *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325–26 (Fed. Cir. 2003)). A statement

is not clear and unmistakable if it is "subject to more than one reasonable interpretation." *Id.* at 1363 (quoting *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1100 (Fed. Cir. 2013)).

The Court finds that Plaintiff's statement to the PTAB does not constitute a clear and unmistakable disclaimer/disavowal. Defendants mischaracterize the nature of Plaintiff's statement. Plaintiff's exact statement to the PTAB was that "Bixler fails to show first and second rotary members (two rotary members). Since fusee f connects cord c (taken as "first primary line") and cord j (taken as "first secondary line"), fusee f is a connector between cords c and j, not a part of the counterbalancing mechanism. Only fusee h can be taken as a rotary member of a counter balancing mechanism." (Defs. Br., Ex. G at 247.) Plaintiff's use of the word "since" denotes the reason why it believed fusee f was not a rotary member: because it was a connector and thus not part of the counterbalancing mechanism. This reasoning does not in any way implicate the number of receiving surfaces fusee f possesses.

The Court has been unable to locate any support in the language of the claims or the specification for limiting the number of receiving surfaces a rotary member may possess. Having considered the intrinsic and extrinsic evidence, the Court adopts Plaintiff's proposed construction: a rotary member is a pulley within the counterbalance mechanism coupled in some way to a spring and having a unique axis of rotation and one or more receiving surfaces.

**2. Rotor (50, 51, 52, 53)**



| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
|---|---|
| A pulley within the upper elongated member having a unique axis of rotation and configured to entrain one or more primary lines on one or more receiving surfaces.  (Pl. Opening Br. 5.) | A single pulley.  (Defs. Br. 9.) |

**Areas of Disagreement Between the Parties**:

Plaintiff and Defendants disagree over whether a "rotor" may have more than one receiving surface.

**Plaintiff's Opening Argument**:

As in the rotary member context, Plaintiff argues that neither the claims nor the specification indicates that a rotor must possess a specific number of receiving surfaces.  (Pl. Opening Br. 5–7.)  Plaintiff also points to Dr. Pratt's report in which he indicates that it is "common" for a pulley (singular) to have multiple receiving surfaces separated by grooves.  (Pratt Report 12, 16.)  For instance, Dr. Pratt provides the following example from an Ebay listing:



Grizzly G6280 Double V-Groove Pulley - 8" Pitch Dia., 1" Bore
by Grizzly

$57.94 √Prime
Only 1 left in stock - order soon.

More Buying Choices
$47.95 new (2 offers)

FREE Shippi
Product Des
... Just like ou
iron double V

**Defendants' Response**:

Defendants argue that Plaintiff "explicitly" disclaimed/disavowed that a "multiple pulley structure" was not a rotor.[4]  (Defs. Br. 6–7.)  Specifically, Defendants

---

[4] Defendants mix up "pulley" with "receiving surface."  What Defendants mean is that Plaintiff explicitly disclaimed/disavowed that a single pulley could have multiple receiving surfaces.

point to Plaintiff's argument in the patent owner's statement for IPR 2015-00488 regarding the Toti patent (prior art). (*Id.* at 8.)



Defendants assert that Plaintiff argued the stacked spools farthest to the right in the above figure from Toti were not a rotor. (*Id.*) Based on this understanding, Defendants contend that Plaintiff should not be able to argue that a multi-surface is not a rotor to preserve its patent before the PTAB and then argue that a multi-surface structure can be a rotor in this infringement proceeding.[5] (*Id.* at 8–9.)[6]

**Plaintiff's Reply**:

Plaintiff countered by arguing in its reply and then at the claim construction hearing that it indicated the structure farthest to the right was not a rotor because it was actually *two* rotors—not *a* unified rotor with two receiving surfaces separated by a groove. (Reply 4–5.)

**The Court's Analysis**:

Plaintiff again seems to put forth the better argument. Plaintiff's exact statement to the PTAB was that "Toti does not show that '. . . at least two lifting cords entrain about the first pulley rotor.' According to Fig. 52 of Toti, it is shown that each pulley 19 entrains one cord, that is, cord 16 **or** cord 17. Namely, cord 16 and cord 17 are not entrained around the same pulley.'" (Defs. Br. Ex. G at 253 (emphasis in original).) Plaintiff was making this argument to differentiate the Toti Patent from its own, which entrained two cords around a single rotor. (*Id.*) In reviewing the context

---

[5] Defendants also argue that Plaintiff indicated that the fusees in Bixler were not rotors. (Defs. Br. 7.) Plaintiff made no such argument, it stated only that the fusees were not rotary members. (*See id.*, Ex. G at 247–48.)

[6] Defendants also highlight that Dr. Pratt's example does not depict a rotor from a window covering mechanism. *See* Pratt Dep. 43:9–44:4, ECF No. 133.

and the language Plaintiff actually used, it is clear that Plaintiff's argument to the PTAB was that its apparatus used a single rotor to entrain two different lines while Toti used two separate rotors to entrain two separate lines—this argument does not preclude a single unified rotor from possessing multiple receiving surfaces, in fact it suggests that the rotors on Plaintiff's apparatus possess multiple receiving surfaces.[7]

Plaintiff's related arguments are equally compelling. As Plaintiff discussed in some detail at the claim construction hearing, the above two-spool structure is depicted elsewhere in Toti's specification.



FIG. 39A

FIG. 40A

FIG. 50

In Figures 39A, 40A, and 50, the structure is referred to as a "pulley unit." The description relating to Figure 50 clarifies the meaning of pulley unit, indicating that the pulley unit in Figure 50 is "comprised" of two "pulleys" "19-19." (Toti Patent,

---

[7] The fact that two cords entrain a single rotor would seem to necessitate two distinct receiving surfaces because otherwise the cords would become tangled.

Col. 18:6–7, ECF No. 133.)  This language strongly supports Plaintiff's position that the structure depicted in Figure 52 is actually two separate rotors.

Plaintiff's position is further bolstered by examining other figures that use the term "pulley unit."  Figures 17 and 18 of Toti include the term "pulley unit" in reference to the structure labeled 18.  (*Id.* at Col. 13:24–25, 53–54.)



FIG. 17



FIG. 18

These figures clearly show two separate pulleys or rotors with airspace in between—confirming that the two pulleys are not attached and suggesting that they each have their own unique axis of rotation.

Finally, the Court notes, as Plaintiff does, that Defendants' own expert witness, Ralph Jelic, who has spent his entire career in the window coverings industry, seems to implicitly agree that Figure 52 depicts two distinct rotors.  Jelic was asked during his deposition whether language pertaining to the identical structure depicted in Figure 39A would lead one to reasonably believe that the structure is comprised of two

separate pulleys. *See* Jelic Depo. 44:5–45:1, ECF No. 136-2. He agreed that it would. Jelic Depo. 45:2. Moreover, Jelic could not identify any language in Toti that describes a single rotor with multiple receiving surfaces. Jelic Depo. 45:3–45:12. In sum, Plaintiff does not appear to have clearly and unmistakably disclaimed/disavowed before the PTAB that a single rotor may not possess multiple receiving surfaces.

After reviewing the language of the claims and the specification, the Court has not found any support for limiting the definition of rotor to a structure with a single receiving surface. Further, Defendants have not put forth any argument that such a limitation exists in the language of the claims or the specification. Accordingly, the Court adopts Plaintiff's proposed construction: a rotor is a pulley within the upper elongated member having a unique axis of rotation and configured to entrain one or more primary lines[8] on one or more receiving surfaces.

### 3. Primary Line(s)/Lifting Cord(s)[9] (104, 105, 113, 114, 115) in the figure on the left and (20, 21) in the figure on the right



---

[8] The primary line aspect of the definition is taken from independent Claim 1 of the '756 Patent, which discloses a "pulley assembly having a first rotor and a second rotor wherein said first primary line is entrained around the first and second rotors." ('756 Patent, Col. 6:60–63.)

[9] The parties agreed at the claim construction hearing that primary line is synonymous with lifting cord. For ease of reference, the Court will use primary line instead of primary line/lifting cord for the remainder of the decision.

| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
|---|---|
| A cord-like member (or cord-like portion of another member) having a unique pathway through the window covering system and adapted to support the weight of a lower elongated member and collapsible member.  (Pl. Opening Br. 10.) | A single cord cannot be both first and second primary lines.  (Defs. Br. 11.) |

**Areas of Disagreement Between the Parties**:

Plaintiff and Defendants disagree over whether one cord can be the first primary and second primary lines described in the patent.

**Plaintiff's Opening Argument**:

Plaintiff argues that what defines each primary line is its unique pathway through the window covering system, not whether it is comprised of a distinct cord. (Pl. Opening Br. 10.)  In support of this construction, Plaintiff points to Figure 17 (shown above) which appears to show a loop at 106 rather than two terminal ends. (*Id.*)  Doubling down on this point, Plaintiff highlights a portion of the transcript from the deposition of Defendants' witness, Ralph Jelic, in which he notes that the loop at 106 allows for the possibility that a single cord could be multiple primary lines as defined by Plaintiff.  (*Id.* at 11.)

**Defendants' Response**:

Defendants first argue that the plain meaning of primary line is a single cord. (Defs. Br. 11.)

Second, Defendants argue that 106 does not depict a loop at all.  (*Id.*) Defendants point out that the specification indicates that "106 joins *ends* of 104 and 105 with secondary line 107."  (*Id.* (emphasis added); *see also* '756 Patent, Col. 6:31.) Third, Defendants point out that the specification indicates the primary lines have two

"terminals," one of which is connected to the lower support member and the other of which is connected to the junction (the point where the primary line and secondary line are coupled). (*Id.* at 10.) Fourth, Defendants point out that their expert, who is undisputedly a POSITA, believes that one skilled in the art would construe each primary line as a separate and distinct cord. (*Id.* at 11.)

**Plaintiff' Reply**:

Plaintiff makes similar arguments to those made in its opening brief: that the language of the claims does not require each primary line be an individual cord and that Figure 17 shows a looping cord that constitutes two primary lines. (Reply 6.) Plaintiff also contends that the ends joined at 106 need not be terminal, instead they may be conceptual—meaning that even though the cord remains intact, there is a point at the junction which delineates one primary line from the other. (*Id.*)

**The Court's Analysis**:

While Plaintiff's arguments are not entirely without merit, the Court finds them unpersuasive. The Court simply does not buy the argument that "ends" can be a conceptual point on a cord—this runs counter to the plain and ordinary meaning of ends. First, this notion leaves it is unclear exactly where the proposed ends would be located—where one primary line would end and the other would begin. Second, it would mean that the word "terminals" refers to different structures at different places in the specification (even within the same sentence): "terminals" at the junction would refer to *a* fold and "terminals" at the lower member would refer to *two* terminal ends. ('756 Patent, Col 2:39–45 ("Yet another object includes containment in the upper support of all of the primary rotors and the tensioning means; the provision of primary lines that have first *terminals* operatively connected to said lower elongated member, below said upper support; and wherein the primary lines have second *terminals* operatively connected to said junction, within the upper support." (emphasis added)).)

///

///



**"Terminals" at the junction**

**"Terminals" at the lower elongated member**

Third, while it is possible that there are multiple embodiments of the respective inventions, it is worth noting just how different the embodiments of "primary lines" would look under Plaintiff's proposed construction:

**or**

Fourth, the first claim, which is an independent claim, calls only for a single primary line—a first primary line. ('756 Patent, Col. 6:50–53.) When in its singular form, primary line can take one of the two above embodiments, the embodiment without the fold:

First Primary Line

(Claim 1)

First and Secondary Primary Lines

(Presumably Claim 2)

Therefore, when adding in a "second primary line" as in dependent Claim 12, one would reasonably expect the addition of an identical line, not that the existing line would suddenly flip and become both lines. To allow such a departure from the plain and ordinary meaning of ends and by extension line or cord, the Court would want to see some language in either the specification or the claims that references either a fold

or portion of a cord in connection with the use of primary lines. However, Plaintiff has not pointed to any such support other than a vague figure.

While the Court is well aware that it may not read limitations from the specification into the claims, it may examine the patent as a whole to better understand the meaning of any given term. *Comark Commc'n*, 156 F.3d at 1186–87; *Phillips*, 415 F.3d at 1313. In examining the patent as a whole and using the specification as a guide, the Court finds that a "primary line" is a distinct cord, such that two primary lines refers to "two distinct cords." The Court adopts a modified version of Plaintiff's construction making the relevant change: a primary line is a cord having a unique pathway through the window covering system adapted to support the weight of a lower elongated member and collapsible member such that two primary lines are two distinct cords.[10]

### 4. Secondary Line (24) and Coupled (corresponding with the junction at 22)



///

<hr />

[10] Defendants' proffered construction is far too vague. It does not adequately describe the function of the cord and does not delineate the function of the primary line from the function of the secondary line.

| Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|
| **Secondary Line**: a member having a unique pathway through the window covering system and adapted to couple a primary line to a counterbalance mechanism. (Pl. Opening Br. 7) | **Secondary Line**: a line coupled with the primary lines so that the secondary line has an endwise connection with the primary lines, and this endwise connection does not pass over any rotor. (Opp'n 14.) |

**Areas of Disagreement Between the Parties**:

Plaintiff and Defendants disagree over whether the connection between the primary and "secondary line" may *pass over any rotor* and whether the connection must be *endwise*.

**Plaintiff's Opening Argument**:

Plaintiff argues that the language of the claims does not contain a limitation requiring that the connection not pass over any rotor. (Pl. Opening Br. at 8.) Plaintiff also points to the deposition testimony of Defendants' witness Ralph Jelic stating the same. (*Id.*)

**Defendants' Response**:

Defendants point to language in the specification indicating that the connection in the above picture moves between rotor fifty and the counterbalancing mechanism depending on the height of the window covering. (Defs. Br. 14; *see also* '756 Patent, Col. 5:44–48 ("[The rotors] serve to entrain the primary lines 20 and 21 in back and forth relation collecting those lines as seen in FIGS. 3 and 4, so as to enable the junction 22 to travel between rotor 50 and the line 24.").)

Defendants also argue that Plaintiff disclaimed during the prosecution of the parent '020 Patent that its invention does not have a connection that passes over a rotor. (Defs. Br. 15–16.) Specifically, Defendants contend that Plaintiff argued Akerstrom (prior art) was distinguishable from its patent because Akerstrom allowed

its connection to pass over a rotor while the connection in Plaintiff's invention at all times remains spaced from the first rotor. (*Id.*)

Defendants also argue that the secondary line must have an endwise connection with the primary line. To support their argument, Defendants reference statements Plaintiff made during prosecution of the '294 Patent. (*See* Defs. Br. 16.) During that prosecution, Plaintiff indicated that the '294 Patent was meaningfully different from Toti (and therefore unobvious) because its primary and secondary lines connected at the same location, whereas in Toti, the first and primary lines affected each other only through the rotation of two interconnected sprockets (see circled portion of Toti figure below). (*Id.*, Ex. P at 1760.)



Based on Plaintiff's argument during prosecution of the '294 Patent that its primary and secondary line connect at the same location, Defendants contend that Plaintiff should not be allowed to argue now that the connection is not endwise. (*Id.*)

**Plaintiff's Reply**:

Plaintiff contends that arguments made during the prosecution of a parent patent do not automatically apply to its progeny. (Reply 7.) Specifically, Plaintiff argues that for a parent's prosecution history to apply to a child patent, the parent patent and the child patent must have the same relevant claim language/limitations. (*Id.* at 8.) Plaintiff argues that the application for the '020 Patent specifically called for a connection that "does not pass over any rotors" whereas the final language of the '756 Patent does not include a similar language. (*Id.*)

Plaintiff also asserts that Defendants are attempting to read limitations from the specification into the claims. (*Id.* at 10.) Plaintiff points out that the second quotation

Defendants discuss notes only a "preference," thus allowing for the possibility that the line is shorter and that the connection does pass over a rotor. (*Id.* at 9–10.)

**The Court's Analysis**:

### i. Whether the connection must not pass over any rotor

While this is a complex and difficult determination well-argued by both sides, the Court ultimately sides with Defendants. *Saunders Grp., Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1335–36 (Fed. Cir. 2007) ("Cases such as this one, in which predecessor applications or patents were drawn to narrow claims and in which the claims in the successor application are arguably broader than the invention described in the specification, present difficult questions of . . . claim construction . . . .")

Defendants' proposed limitation does not appear in the '756 Patent's claim language. Therefore, the parties' arguments necessarily turn on language in the specification and any relevant disclaimer/disavowals, and if necessary, on the opinions of their experts. As the previous paragraphs show, the specification does not strongly favor either party. While Defendants highlight language from the Detailed Description that suggests the connection in the depicted embodiment does not pass over any rotor, Plaintiff highlights language from the same section of the patent that appears to specifically contemplate embodiments in which the connection *does* pass over a rotor. (*Compare* '756 Patent, Col. 5:44–48 ("[The rotors] serve to entrain the primary lines 20 and 21 in back and forth relation collecting those lines as seen in FIGS. 3 and 4, so as to enable the junction 22 to travel between rotor 50 and the line 24."), *with id.* at Col. 2:32–35 ("[T]he primary rotors *preferably* include a first rotor having spacing from the counter-balancing means which exceeds the path of travel, for shade or blind height adjustment between uppermost and lowermost portions." (emphasis added)).)

Defendants, however, make a strong argument steeped in principles of disclaimer/disavowal that ultimately sways the Court. Defendants begin by identifying two possible sources for disclaimer/disavowal: Plaintiff's statements to the

PTO in connection with the '020 Patent and the '020 Patent's specification. *See Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) ("Disavowal can be effectuated by language in the specification or the prosecution history." (citing *Phillips*, 415 F.3d at 1316–17)). Defendants pointed out at the claim construction hearing that Plaintiff argued to the PTO during the prosecution of the '020 Patent that its apparatus was distinguishable from prior art precisely because the connection between its primary and second line does not pass over any rotor. Therefore, by implication, Plaintiff's statements disclaim/disavow coverage of any apparatus with a connection that passes over a rotor. *Poly-Am., L.P.*, 839 F.3d at 1136 (noting that a disclaimer/disavowal need not be "explicit"); *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997) ("[S]ince, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover, he is by implication surrendering such protection."). Defendants also point out that the '020 Patent's specification makes the same disclaimer/disavowal using even broader language: "It is yet another object of the invention to provide a path of travel for the defined line connection or interconnection, which extends lengthwise of the upper support, and which does not pass over any rotors, and whereby possible derailment of that connection by a rotor is prevented." ('020 Patent, Col. 1: 53–57).

Plaintiff responded at the claim construction hearing by arguing that Defendants' arguments to the PTO cannot be disclaimers/disavowals because they merely repeat and seek to justify claims of the patent; they do not narrow the '020 Patent's claim scope. *See e.g. Heuft Systemtechnik GmbH v. Indus. Dynamics Co., Ltd.*, 282 Fed. Appx. 836, 839 (Fed. Cir. 2008) ("Prosecution disclaimer occurs when a patentee, either through argument or amendment, surrenders claim scope *during the course* of prosecution." (emphasis added)). However, this reasoning misses the mark; published case law makes clear that a disclaimer/disavowal can occur from a simple statement differentiating the patent in question from prior art and that language of a specification or patent claim can, *by itself*, function as a disclaimer/disavowal. *See*

*Ekchian,* 104 F.3d at 1304; *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (indicating that disclaimer/disavowal only requires "the specification [or prosecution history] make[ ] clear that the invention does not include a particular feature" (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001)); *see also Poly-Am., L.P.*, 839 F.3d at 1136.

Defendants next argue that these disclaimers/disavowals should carry through to the '756 Patent because they relate to the invention "as a whole." As Defendants correctly stated at the claim construction hearing, a disclaimer/disavowal may be imported from a parent patent to a child patent either where the patents share the same claim language or where the disclaimer/disavowal is directed to the scope of the invention "as a whole." *See Implicit L.L.C. v. F5 Networks, Inc.*, No. 14-CV-02856-SI, 2015 WL 2194627, at *12 (N.D. Cal. May 6, 2015). Examples of language directed to the scope of the invention as a whole include "'the present invention requires . . .' or 'the present invention is . . .' or 'all embodiments of the present invention are . . .'" *Id.* (quoting *Hill-Rom Servs.*, 755 F.3d at 1372).

The Court agrees with Defendants that the statements in the prosecution history and specification were meant to apply to the invention as a whole. While some portions of the prosecution history discussing "not pass[ing] over any rotor" reference the language of what ultimately became Claim 1 of the '020 Patent, Plaintiff's discussion elsewhere in the prosecution history is not so limited. (*See* Defs. Br., Ex. O at 1578 ("In amended claim 1 . . .").) For instance, on page 1617 of Exhibit L attached to Defendant's claim construction brief, Plaintiff discusses the difference between his "structure," which does not have a connection that "passes over" any rotor and the "opposite" prior art. The Court also finds that the '020 Patent's specification offers some clarification. The specification indicates that "It is yet another object of the invention to provide . . . a connection . . . which does not pass over any rotor." ('020 Patent, Col. 1: 53–57.) The language "[i]t is yet another object

of the invention" is very similar to "the present invention requires," or "the present invention is" and thus strongly suggests that this language refers to the invention as a whole rather than just Claim 1.[11]   Taken together, the prosecution history and the specification of the '020 Patent convince the Court that any disclaimer/disavowal regarding "not pass[ing] over a rotor" was meant to apply to the invention as a whole and is thus properly imported from parent to child despite variations in claim language between the two patents.  *See Regents of Univ. of Minnesota v. AGA Med. Corp.*, 717 F.3d 929, 943 n.8 (Fed. Cir. 2013).

At this point, the Court believes it is useful to take a step back and examine more broadly what is going on here.  The '020 Patent's specification, the arguments made during prosecution of the '020 Patent, and Plaintiff's own statements during the claim construction hearing, make clear that at least one of the reasons the PTO allowed the '020 Patent was because its connector did not pass over any rotor.  This seemingly small inventive step is actually quite meaningful—it ensures that the lines do not derail and that the connector does not get stuck behind the rotor causing the window covering to jam.

Plaintiff then filed for and obtained the '756 Patent which was a continuation-in-part of the '020 Patent.   Based on Plaintiff's arguments during the claim construction process, it appears Plaintiff was attempting, among other things, to obtain coverage not only of an apparatus containing its previous invention, a connector that does not pass over any rotor, but also of *the very prior art* that it distinguished in order

---

[11] The Court is aware of only one case discussing whether the "object" of an invention refers to the invention as a whole, and that case does not definitively resolve the issue.  *See Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1025 (Fed. Cir. 2015).  In *Pacing Technologies*, the Federal Circuit indicated that use of "object of the present invention" "will not *always* rise to the level of disclaimer" which suggests that in most instances this language does refer to the invention as a whole and function as a disclaimer/disavowal.  *Id.* (emphasis added).  In dicta, the court surmised that one exception might be where the number of "objects" is so numerous as to render it "unlikely" that they were meant to apply to the invention as a whole.  *Id.*  The court suggested that a patent with nineteen separate "objects" of invention might be subject to this exception.  *Id.* Here, the '020 Patent appears to have six "objects" of invention, less than a third of the nineteen "objects" of invention the court suggested might be too numerous.  (*See* '020 Patent, Col. 1: 31–Col. 3:23.)

to obtain the '020 Patent: an apparatus' containing connectors that *do* pass over a rotor. The Court will not allow such a maneuver, especially where, as here, Plaintiff has received and is receiving the benefit of filing the '756 Patent as a continuation-in-part application.[12] The Court finds the '756 Patent's coverage is limited to apparatuses containing a connection that does not pass over any rotor.

## ii. Endwise Nature of the Connection

Defendant argues that the nature of the secondary line's connection to the primary line(s) is "endwise," meaning an end coupled with an end. (*See generally* Defs. Br. 14–16.) While Plaintiff has disputed what an end looks like (a fold versus a terminal end, as addressed in the primary line context above), it has never disputed that the connection is anything but "endwise." Indeed, Plaintiff's attorney stated in no uncertain terms at the claim construction hearing, "I'm saying that the two primary lines have an endwise connection to the secondary line, and that would be correct."

The language of the claims and the specification supports Defendants' inclusion of "endwise" in the construction of secondary line. Claim 1 indicates that the secondary line has a "distal end coupled to a primary line." ('756 Patent, Col. 6:57–59.) The Detailed Description in the specification notes a joining of "ends . . . 104 and 105 [primary lines] with secondary line 107" and "secondary line 117 joined to ends of 113–115." (*Id.*, Col. 6:31–32, 36–37.) The language of the claims confirms that the secondary line's connection with the primary line is via an end and the specification makes clear that the primary lines' connection with the secondary line is via an end—therefore, the Court finds that it is reasonable to infer that the connection is "endwise."

Defendants also go on to argue that Plaintiff made certain disclaimers in connection with the '294 Patent that also suggest the connection is "endwise." (*See*

---

[12] The Court is well aware that the primary use of continuation-in-part applications is to allow for the addition of new subject matter to an existing patent, which might have the effect of broadening claim coverage. However, the Court does not believe this broadening was meant to allow for the capture of prior art, especially prior art which a patentee explicitly distinguished.

Defs. Br. 16.)  With Plaintiff in seeming agreement that the connection is "endwise" and with the language of the claims and the specification together suggesting such a connection, the Court does not find it is necessary to undertake this additional analysis.  The Court finds that Defendants' construction of secondary line properly includes reference to an "endwise connection."

In sum, the Court will adopt a modified version of Defendants' secondary line construction: a secondary line is a line possessing an endwise connection with one or more primary lines that does not pass over any rotor.

**5.  Coupled**



| Plaintiff's Proposed Constructions | Defendants' Proposed Construction |
|---|---|
| **Coupled**: joined or linked, directly or indirectly.  (Pl. Opening Br. 12) | **Coupled**: not clearly defined/intertwined with definition of secondary line. |

The parties do not appear to be in disagreement over the construction of "coupled."  Defendants originally seemed to imply that coupled refers only to a direct connection.  (JCCPS, Ex. B at 15 (defining the phrase "a secondary line coupled to said at least to primary lines" as: "a secondary line is connected to at least two separate lift cords and has an endwise connection with each of the lift cords such that a terminal end of the secondary line is connected *directly* to the terminal ends of each

of the lift cords." (emphasis added)).) However, in Defendants' opposition brief they indicated that the "only" remaining areas of disagreement with regard to coupled were the issues now addressed in the context of the secondary line construction: whether the connection passes over any rotor and whether the connection is endwise. (Defs. Br. 13.) Further, Defendants did not argue that the connection could only be direct during the claim construction hearing. The Court can find no support in either the language of the claims or the specification for limiting coupled to a direct connection, and Defendants have not identified such support. Accordingly, the Court adopts Plaintiff's construction: joined or linked, directly or indirectly.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

# V.   CONCLUSION

In light of the foregoing, the Court adopts:

1.  **Plaintiff's** construction of the term "rotary member";
2.  **Plaintiff's** construction of the term "rotor";
3.  **The Court's** construction of the term "primary line";
4.  **A modified version of Defendants'** construction of the term "secondary line";
5.  **Plaintiff's** construction of the term "coupled."

The parties shall submit a joint proposed schedule order regarding all outstanding dates and deadlines in this action by **July 10, 2017**.

**IT IS SO ORDERED.**

June 26, 2017

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**